## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QUIZINSIGHT.COM PARTNERSHIP,<br>　　2731 Woodley Place, NW<br>　　Washington, DC 20008,<br>　　　　a District of Columbia partnership,<br><br>SECRET UNIVERSE OF NAMES<br>PARTNERSHIP,<br>　　2731 Woodley Place, NW<br>　　Washington, DC 20008,<br>　　　　a District of Columbia partnership,<br><br>ROY FEINSON,<br>　　2731 Woodley Place, NW<br>　　Washington, DC 20008,<br><br>　　　　Plaintiffs,<br><br>　　　　　　v.<br><br>ROSS LEE TABAK, a.k.a. RAUS TABURK,<br>　　279 Erwin Road<br>　　Chapel Hill, NC 27514,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. 1:18-cv-1878 |

## VERIFIED COMPLAINT

Plaintiffs QuizInsight.com Partnership ("QZI"), Secret Universe of Names Partnership ("SUN"), and Roy Feinson (collectively, "Plaintiffs") bring this action against defendant Ross Lee Tabak, a QZI and SUN partner and web-development contractor with Mr. Feinson in connection with Mr. Feinson's AnimalInYou.com ("AIY") website. Plaintiffs seek to recover not only intellectual property and funds that Mr. Tabak wrongfully seized in violation of law and in breach of contract and fiduciary duties as a SUN and QZI partner, but also compensatory damages Plaintiffs incurred as the result of Mr. Tabak's actions, as well as punitive damages in tort and treble damages under the Racketeer Influenced and Corrupt Organization Act ("RICO").

## PARTIES

1.　　Plaintiff Roy Feinson is a resident of the District of Columbia and is the owner of

1

the AIY intellectual property, as well as a partner in the SUN and QZI partnerships.

2.     Plaintiff Secret Universe of Names Partnership ("SUN") is a District of Columbia partnership formed between Mr. Feinson and the defendant in 2015 to operate the SecretUniverse-ofNames.com (the "SUN Website"). SUN's principal office is in the District of Columbia.

3.     Plaintiff QuizInsight.com Partnership ("QZI") is a District of Columbia partnership formed between Mr. Feinson and the defendant in 2016 to develop quiz-based websites and other related activities. QZI's principal office is in the District of Columbia.

4.     On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, defendant Ross Lee Tabak is a resident of North Carolina, currently located in Thailand; he provided technical services as a web developer under the AIY contract and as a partner in SUN and QZI.[1]

## JURISDICTION AND VENUE

5.     This action arises out of Defendant's ongoing violations of several federal and state statutes that form a pattern of racketeering activity under the 18 U.S.C. §1964(c) and infringe Mr. Feinson's copyrights under the Copyright Act of 1976, 17 U.S.C. §§101-1332, thus raising federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. §1331. In addition, this action arises out of Defendant's ongoing violations of the laws of the District of Columbia and breach of contract, over which this Court has jurisdiction not only pursuant to the Court's supplemental jurisdiction, 28 U.S.C. §1367, but also pursuant to diversity jurisdiction, 28 U.S.C. §1332, because the amount in controversy exceeds $75,000 and the plaintiffs are diverse in

---

[1]     On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, Mr. Tabak has not established permanent residence in Thailand and so remains a North Carolina resident.

citizenship from the defendant.

6.      Pursuant to 28 U.S.C. §1391(b) and 18 U.S.C. §1965(a), venue is proper in the District of Columbia because the SUN and QZI partnerships are based in the District of Columbia and Defendant transacted affairs under these partnerships.

7.      Similarly, personal jurisdiction is proper in the District of Columbia because Defendant availed himself of the District's laws not only by forming but also by operating a partnership in the District of Columbia.

8.      An actual and justiciable controversy exists between Plaintiffs and Defendant in that Defendant has stolen Plaintiffs' property and Plaintiffs seek injunctive relief to require the return of that property, as well as money damages.

## LEGAL BACKGROUND

9.      Plaintiffs raise not only statutory claims under federal and District of Columbia law but also common-law claims under District of Columbia law.

**Common Law**

10.      Under the District of Columbia's common law, every contract includes the implied covenant of good faith and fair dealing, which includes an "implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988) (internal quotations omitted).

11.      Under the District of Columbia's common law, a party claiming breach of contract can seek punitive damages – notwithstanding a general limitation to contract damages – when "the alleged breach of contract merges with, and assumes the character of, a willful tort." *Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (*citing Brown v. Coates*, 253 F.2d 36, 39 (D.C.

Cir. 1958)) (interior quotations omitted).

12.     The equitable remedy of an accounting is available to unravel complicated financial matters. *Landise v. Mauro*, 141 A.3d 1067, 1072-73 (D.C. 2016).

13.     Constructive trusts are a flexible remedial device used to force restitution in order to prevent unjust enrichment, even if the inequitable conduct falls short of fraud. District of Columbia law allows the equitable remedy of a constructive trust not only for more culpable inequities (*e.g.*, embezzlement, conversion, fraud, duress), but also for mere mistake. *Hertz v. Klavan*, 374 A.2d 871, 873 (D.C. 1977).

**The District of Columbia Uniform Partnership Act**

14.     Under D.C. Code §29-602.03, property acquired by a partnership shall be property of the partnership and not of the partners individually. Similarly, under D.C. Code §29-604.01(j), a partner shall use or possess partnership property only on behalf of the partnership.

15.     Under D.C. Code §29-602.04(c), property is presumed to be partnership property if purchased with partnership assets, even if not acquired in the name of the partnership.

16.     Under D.C. Code §29-604.01(k), a partner shall not be entitled to remuneration for services performed for the partnership's typical operations.

17.     Under D.C. Code §29-604.06(c)(1)-(2), each partner and the partnership shall furnish to a partner the following: (a) without demand, any information concerning the partnership's business activities and affairs reasonably required for the proper exercise of the partner's rights and duties under the partnership agreement or this chapter; and (b) on demand, any other information concerning the partnership's business activities and affairs, except to the extent the demand or the information demanded is unreasonable or otherwise improper under the circumstances.

18. Under D.C. Code §29-604.07(b), partners have the following fiduciary duties of loyalty:

> (1) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

> (2) To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

> (3) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

Under D.C. Code §29-604.07(c), partners have the fiduciary duty of care to refrain "from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law."

19. Under D.C. Code §29-606.01(5)(A)-(C), a District of Columbia partnership can seek judicial expulsion of a partner for misconduct if the partner takes any of the following actions:

> (A) Engaged in wrongful conduct that adversely and materially affected the partnership business;

> (B) Willfully or persistently committed a material breach of the partnership agreement or of a duty owed to the partnership or the other partners under §  29-604.04; or

> (C) Engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner;

20. Under D.C. Code §29-606.01(1) and §29-606.02(a), a partner may dissociate from a partnership by notifying the partnership of the partner's express will to withdraw as a partner, but the dissociation can be either rightful or wrongful. D.C. Code §29-606.02(a). Dissociation is wrongful when it is in breach of the partnership agreement, D.C. Code §29-606.02(b)(1), and the dissociating partner is "liable to the partnership and to the other partners for damages caused by the dissociation," which "liability shall be in addition to any other obligation of the partner to the

partnership or to the other partners." D.C. Code §29-606.02(c). Under D.C. Code §29-606.03(c), dissociation alone does not discharge a former partner from a debt, obligation, or other liability to the partnership or to the other partners that the person incurred while a partner.

21.     Under D.C. Code §29-604.08(a), partners may sue in law or equity, with or without an accounting, to enforce rights under a partnership agreement or rights under the Uniform Partnership Act.

**Civil RICO and Predicate Acts**

22.     Congress enacted RICO as part of the Organized Crime Control Act of 1970, Pub. L. No. 91-452, §901(a), 84 Stat. 922, 941-47 (Oct. 15, 1970). In doing so, Congress directed that "[t]he provisions of this title shall be liberally construed to effectuate its remedial purposes." *Id.* §904(a), 84 Stat. at 947. Although enacted to aid the government in prosecuting organizes crime, RICO applies equally to unlawful business practices if those practices violate RICO's terms.

23.     In addition to targeting criminal actions, RICO also includes 18 U.S.C. §1964(c), which provides a civil cause of action to "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. §1962]." As relevant here, 18 U.S.C. §1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

24.     Under 18 U.S.C. §1961(5), a "pattern of racketeering activity" means "at least two acts of racketeering activity," and under 18 U.S.C. §1961(1), the term "racketeering activity" consists of any of numerous listed crimes, including extortion under state law and the federal crimes of wire fraud (18 U.S.C. §1343), bank fraud (18 U.S.C. §1344), theft of trade secrets (18 U.S.C. §1832), and interstate transportation of stolen property (18 U.S.C. §§2314-2315).

25.     Under 18 U.S.C. §1964(c), RICO's civil action includes an entitlement to a reasonable attorney-fee award and treble damages.

## FACTUAL BACKGROUND

26.     Mr. Feinson is a Washington D.C. based author whose publications include *The Animal in You* (St. Martin's Press 1998), and *The Secret Universe of Names* (Woodstock 2004).

27.     The Library of Congress Control Number ("LCCN") for *Animal in You* is 97043744, and its International Standard Book Number ("ISBN") is 0312180403.

28.     Since its publication as a book, Mr. Feinson's AIY copyright has earned more than $250,000 in book sales and internet advertising.

29.     The LCCN for *The Secret Universe of Names* is 2005298235, and its ISBN is 9781585675944.

30.     Mr. Feinson holds the copyright for *The Animal in You* and *The Secret Universe of Names* and owns the web property "AnimalInyou.com" ("AIY Website").

**AIY Contract**

31.     From March 2009 to October 2009, Mr. Feinson employed Mr. Tabak as a contractor to upgrade the AIY Website. At that time, the AIY Website earned approximately $600 per month.

32.     After Mr. Tabak decided to leave Washington, he offered to continue upgrading the AIY Website in exchange for 50% of revenue exceeding $600 per month from online advertising revenue. Mr. Feinson accepted the offer.

33.     The AIY contract was supported by mutual consideration: Mr. Feinson provided the copyrighted site content and shared the revenue, and Mr. Tabak provided the internet coding, marketing, and connection to search engines and advertising revenue.

**SUN Partnership**

34.     In 2015, Mr. Tabak and Mr. Feinson entered the SUN partnership to monetize Mr. Feinson's property in *The Secret Universe of Names*.

35.     Acting for SUN in his capacity as a SUN partner, Mr. Tabak registered the domain SecretUniverseofNames.com ("SUN Domain") with Namecheap.com, with Mr. Feinson as a secondary manager of this domain. SUN reimbursed Mr. Tabak for all costs incurred to register and maintain the SUN Domain.

36.     Under the SUN partnership agreement, Mr. Feinson received 60% of the revenue and provided concept, text and databases (while retaining all ownership rights to content provided to SUN), Mr. Tabak received 40% of the revenue for constructing the website, writing the code, engaging in marketing, and site management.

37.     Paragraph 6 of the SUN partnership agreement provides Mr. Feinson "[at] all times … access to edit and update the contents of the Website, and as principal owner has the right to make final decisions on all aspects of the site."

38.     Paragraph 10 of the SUN partnership agreement provides for terminating the partnership at Mr. Tabak's choice, in which case Mr. Tabak agreed to a buyout of his partnership share (including all code associated with the SUN Website) for nine months revenue:

> The Partnership may be dissolved at any time with the consent of both partners. The Partnership may also be dissolved if [Mr. Tabak] chooses, or is unable, not to provide ongoing Maintenance for the website. In this event, [Mr. Tabak] agrees to sell his Partnership shares to [Mr. Feinson] for a sum equal to nine months of net revenue based on the average net revenue of the previous twelve months. This sale shall include the transfer of ownership of all code associated with the Website.

39.     Paragraph 15D of the SUN partnership agreement prohibits "any act detrimental to the interests of the Partnership or which would make it impossible to carry on the business or

affairs of the Partnership."

40.     The SUN partnership agreement was supported by mutual consideration: Mr. Feinson provided the copyrighted site content and shared the revenue, and Mr. Tabak provided the internet coding, marketing, and connection search engines and advertising revenue.

**QZI Partnership**

41.     In 2016, Mr. Tabak and Mr. Feinson entered the QZI partnership to "engage in the business of creating, marketing and maintaining a website or websites offering free personality and other tests to users, and such other related activities as shall be agreed upon by the partners" (¶3), and the agreement applied to "Quizexplosion.com, Quizinsight.com or any web Quiz-based system that either party creates (with the exception of Animalinyou.com)" (¶1).

42.     The name of the initial website was Quizinsight.com ("QZI Website").

43.     Quizoneer.com is an element of the QZI business that enables users to create their own web tests for their personal or business websites.

44.     Acting for QZI in his capacity as a QZI partner, Mr. Tabak registered the various QZI-related domains – including without limitation Quizinsight.com and Quizoneer.com ("QZI Domains") – with Namecheap.com, with Mr. Feinson as a secondary manager of this domain. QZI reimbursed Mr. Tabak for all costs incurred to register and maintain the QZI Domains.

45.     Paragraph 8 of the QZI partnership agreement provides that the partners shall have equal rights in the management of the partnership business.

46.     Paragraph 11 of the QZI partnership agreement provides the partnership shall maintain adequate accounting records on a cash basis of accounting, and open to inspection by each partner.

47.     Paragraph 12 of the QZI partnership agreement provides that all partnership funds

shall be deposited with such banks as may be designated by the partners.

48.     Paragraph 16 of the QZI partnership agreement provides "All Company IP created for the partnership, whether content, code or marketing materials, belong to the partnership."

49.     Paragraph 4 of the QZI partnership agreement provides that the "partnership shall continue until terminated by mutual consent or dissolution by operation of law."

50.     Paragraph 14 of the QZI partnership agreement provides for terminating the partnership at a partner's request, which gives the remaining partner the right to continue the partnership business for a buyout of the terminating partner's share for fair market value determined by a neutral accountant:

> This partnership shall be terminated by the death or material incapacity of any partner, mutual agreement, or upon the written request for termination made by any one partner. Upon termination by reason of death, incapacity or request, the remaining partners shall have the right to continue the business of the partnership on their own behalf or together with new or additional partners, provided they pay the terminated partner the fair market value of his partnership interest (as determined by a neutral accountant for the partnership) together with suitable indemnification for all of their existing partnership obligations.

51.     The QZI partnership agreement was supported by mutual consideration: each partner provided content and labor, and the partners shared the revenue.

52.     Although Mr. Feinson had a slightly higher contractual share of SUN revenue (60%), on or about April 20, 2016, he orally offered Mr. Tabak to treat all website revenue as a common pool, after subtracting Mr. Feinson's $600 monthly share for AIY and to use the industry-standard formula for website valuation (namely, three times annual profits), notwithstanding the SUN partnership agreement's lower buy-out formula (nine months of average revenue). Although not reduced to writing, the parties proceeded under this oral agreement.

**Financial Arrangements under the *Status Quo Ante Litem***

53.     Contemporaneously with forming the SUN partnership, Mr. Tabak and Mr. Feinson formed three accounts to facilitate advertising revenue for the websites: (1) a PayPal account in SUN's name, and (2) an AdSense account in Mr. Tabak's name, and (3) an Ally Bank account in Mr. Feinson's name.

54.     From 2016 to May 2018 the combined income from the AIY, SUN, and QZI websites was between $24,000 and $35,000 annually, with the profits allocated according to the AIY, SUN, and QZI agreements. Of these annual revenues, AIY provided approximately 75%, SUN provided approximately 5%, and QZI provided approximately 20%.

55.     During the course of the partnerships' operation, Mr. Feinson reported Mr. Tabak's income on IRS Form 1099's, which Mr. Feinson sent to Mr. Tabak's Chapel Hill address, at Mr. Tabak's request.

56.     In 2016, the QZI partners agreed to take a series of loans to pay consultants and fund marketing efforts. Mr. Feinson made an initial interest-free one year loan of $6,500 to QZI, and additional loans totaling $12,000 under the terms of a loan agreement executed by Mr. Feinson and Mr. Tabak. The unpaid balance of the loans is approximately $11,385.

57.     Paragraph 10 of the loan agreement provides that "[i]n the event of default, both partners guarantee to repay the loan with equity" and that "[e]quity will be calculated as follows: (Monthly QZI profit (excluding distributions) - $600) X 36)."

58.     In setting the loans' repayment rate at three times annual profits, the parties relied on their oral agreement to value the websites at that rate, which is the industry standard for website valuations.

**Tabak's Actions to Breach the AIY Contract and the SUN and QZI Partnerships**

59.     In May 2018, Mr. Tabak began to argue that he should own Quizoneer.com as his wholly own personal property, which conflicts with Paragraphs 3 and 16 of the QZI partnership agreement, quoted in Paragraphs 41 and 48 above.

60.     Mr. Feinson noted the conflict with the current QZI partnership agreement, but offered to renegotiate a 75-25 split with Mr. Tabak, which Mr. Tabak rejected in an email dated May 17, 2018, that made various threats and demands as well as erratic and unfounded claims, including the following:

> "You will cease collecting interest from any loans made to the partnership ... and refund all interest already collected"

> "We will sign a new agreement..."

> "All QZI code, tech, 'ideas' and any other non-content IP will be released into the public domain".

> "There will be a specific provision that acknowledges Quizoneer's independence and protects it from any royalty or IP claims".

> "Neither you nor QZI will receive any concessions from Quizoneer".

> "Should you choose to escalate this by involving a third party (such as an attorney or outside developer) or tampering with the websites ... all properties will be suspended...".

61.     Mr. Tabak also alleged the *non sequitur* that Mr. Feinson was "cooking the books" by bringing in money from "somewhere else," which appears irrational if Mr. Tabak's core complaint was that the partnerships were making insufficient revenue. Similarly, putting QZI intellectual property in the "public domain" would reduce QZI's value without providing anything to Mr. Tabak.

62.     Mr. Feinson responded to Mr. Tabak's threats and demands with a counterproposal to unwind QZI pursuant to the QZI partnership agreement and asked for Mr. Tabak's comments

on a dissolution plan that Mr. Feinson suggested. Mr. Feinson's proposal included the following:

> "If we cannot resolve disagreements, we will use binding arbitration as called for in our agreement."

> "Once we've established net value, the selling partner is entitled to 50% of that value and relinquishes all rights to the properties."

> "We must settle the issue of Quizoneer, which under our agreement belongs to QZI."

> "I can buy you out, or you can buy me out."

> "If I buy you out, you agree to transfer full access of the sites in working condition and include a 3 month warranty."

> "Until the wrap-up is concluded, all existing agreements apply."

63.     By email dated May 18, 2018, Mr. Tabak responded by rejecting Mr. Feinson's proposal and making new demands, including the following:

> "You will sign an interim QZI agreement..."

> "You will not argue, bargain, or pull any Trumpian bullshit like counter-accusations of libel/extortion/fraud or sending threatening legal notices."

> "You will be agreeable and cooperative...."

> "The total amount of your (initial) payment to me will be $2511.05. I expect the full amount by 8pm EST today (Friday, May 18). I suggest you send it first and raise any objections later."

> "If there is any cash in the Ally account, you will immediately transfer it to PayPal ..."

> "We will discuss the repayment of the loan principal during the buyout. If we make it that far."

> "You will repay me for the past decade of wasted work and misplaced trust."

64.     Mr. Tabak stated "I'll see you in DC as soon as possible," which Mr. Feinson interpreted as a threat since Mr. Feinson was not (and is not) aware that Mr. Tabak has business dealings or family in Washington D.C., other than the SUN and QZI partnerships.

65.     After Mr. Feinson rejected these demands, on or about May 18, 2018, Mr. Tabak removed advertising from the websites, thereby depriving Mr. Feinson, SUN, and QZI of revenue.

66.     Apparently realizing that his actions also denied him revenue, on or about May 20, 2018, Mr. Tabak reinstated the advertising and used the Google AdSense account under Tabak's control to divert incoming funds to a bank account under his control.

67.     On May 21, 2018, Mr. Feinson proposed that Mr. Tabak restore the accounts, share control of the websites, and unwind the partnership as per their agreement and indicated that Mr. Feinson would commence legal proceedings if Mr. Tabak refused.

68.     Despite having already stolen approximately $2,000 from the partnership's AdSense account, Mr. Tabak appeared to be desperate for money.

69.     On May 22, 2018, Mr. Tabak rejected Mr. Feinson's proposal and responded with further demands and threats, including a threat to file a spurious lawsuit to defame Mr. Feinson and a demand for money, which appeared to be in the tens of millions (*i.e.*, a "few zeros" on top of a five-figure valuation):

> "For $2000 my lawyers will put together a lawsuit. My side of the story will be entered into the public record, along with your "final letter" and any emails I deem relevant. That information will be available to anyone who googles your name. Anyone will be able to talk about it, write articles, issue press releases, etc. at any time and you will not be able to threaten them with defamation lawsuits."

> "The neutral valuation will have a few zeros on whatever pittance you came up with. If you won't pay then the partnership will simply be dissolved. The websites will be deleted, I will be free to use the IP to create Quizoneer and all you will have left is the text of AIY and SUN."

> "The better your initial offer the better the deal you're going to get".

70.     After Mr. Feinson rejected these demands, Mr. Tabak responded by email on May 29, 2018, that "I'm exiting the partnership without a buyout because you're a worthless piece of

shit. Fuck off Feinson, you're of no use to anybody."

71.     Before Mr. Feinson could respond, Mr. Tabak took a series of unilateral actions with respect to AIY, SUN, and QZI property: (1) disconnected the AIY Website, the SUN Website, and the QZI Domains (except Quizoneer.com) from the internet, causing irreparable harm to those properties by depriving them of search engine indexing and eliminating the associated revenue streams for Mr. Feinson (AIY), SUN, and QZI; (2) on information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, Mr. Tabak deleted, discontinued, or disabled the computer code for those websites from a server located in Clifton, New Jersey, managed by DigitalOcean.com; (3) Mr. Tabak failed to restore ownership for the SUN Domain and the QZI Domains to SUN and QZI, respectively; and (4) Mr. Tabak disconnected Mr. Feinson as manager of the Namecheap.com account that registers the SUN Domain and the QZI Domains.

72.     Based on past revenue, from the time that Mr. Tabak diverted the Google AdSense revenue to an account controlled by him until the time Mr. Tabak disconnected all of the websites except Quizoneer.com from the internet (thus ending the revenue stream), Mr. Tabak would have diverted approximately $2,000 to his personal use, but the exact amounts would require discovery, an accounting, or access to the AdSense account.

73.     On both May 30, 2018, and On June 6, 2018, after Mr. Tabak had taken down the AIY, SUN, and QZI websites, Mr. Feinson received notice that Facebook had attempted to charge the Ally Bank account $364.12 for advertising on Facebook, which the parties had discontinued more than a year ago. (Because the Ally Bank account had a balance of less than $5.00, the Facebook charges did not go through.)

74.     Insofar as Mr. Feinson did not initiate the Facebook advertising and Mr. Tabak was

the only other person with access to the Facebook account, on information and belief, formed after reasonable inquiry, which likely could be proved by discovery, Mr. Tabak revived the dormant Facebook account and attempted to initiate advertising for then-nonexistent websites out of malice to divert money from Mr. Feinson's Ally Bank account to Facebook.

75.     Mr. Tabak's is fully aware that his intentional actions will cause QZI's loans to default, and has implied that he has no intention of ever repaying his share of those loans. On information and belief, formed after reasonable inquiry, which likely could be proved by discovery, Tabak has no intention of ever repaying his share of the loans.

76.     On June 3, 2018, an attorney engaged by Mr. Feinson sent Mr. Tabak a letter offering to negotiate the winding down of the partnerships and demanding reinstatement of the websites and accounts that Mr. Tabak unilaterally took down or diverted, but Mr. Tabak simply ignored this letter.

77.     On June 5, 2018, Mr. Feinson learned that Mr. Tabak had taken similar actions against a prior business partner.

78.     In 2014, Brett Whiteside hired Mr. Tabak to assist with online versions of Mr. Whiteside's paid courses. Once Mr. Tabak had access to Mr. Whiteside's online presence, Mr. Tabak attempted to extort large sums of money under the threat to provide Mr. Whiteside's analytics data and site contents to Mr. Whiteside's competitors.

79.     When Mr. Whiteside refused Mr. Tabak's demands, Mr. Tabak purchased similar domain names (including brettwhiteside.com), posted Mr. Whiteside's paid courses for free onto these sites, and attempted to email these links to Mr. Whiteside's mailing list.

80.     On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, Mr. Tabak intended and planned the takeover and

destruction of Mr. Feinson's property and the usurpation of partnership assets, cash and future revenues at the time he entered the SUN and QZI partnership agreements.

81.     On or about July 23, 2018, fiver Uber drivers in succession came to Mr. Feinson's office when Mr. Feinson had not ordered Uber service, indicating that someone had likely hacked (*i.e.*, gained surreptitious access to) his Uber account.

82.     Given the timing of this prank *vis-à-vis* the dispute with Mr. Tabak, Mr. Tabak's technical prowess, and Mr. Tabak's actions against Mr. Whiteside, on information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, Mr. Tabak initiated the Uber requests by hacking Mr. Feinson's Uber account with the intent to harass Mr. Feinson.

83.     Mr. Tabak continues to operate and exclusively control QZI's Quizoneer.com website using QZI intellectual property.

## COUNT I
## CIVIL RICO

84.     Plaintiff incorporates Paragraphs 1-83 and 110-169 as if fully set forth herein.

85.     A RICO claim under 18 U.S.C. §1964(c) requires (1) a pattern of RICO predicate acts by the defendant; (2) the plaintiff suffered injury to business or property; and (3) defendant's racketeering activity proximately caused plaintiff's injury.

86.     In addition, where the prohibited activity falls under 18 U.S.C. §1962(c), a RICO claim further requires (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity. Although the U.S. Court of Appeals for the Third Circuit has held otherwise, nothing in RICO prevents the defendant's enterprise from being a victim and thus a RICO plaintiff.

87.     Because each RICO predicate act involves a violation of other statutes, each type of predicate act also will require various elements to state a claim for that predicate act.

88.     As set forth below, Mr. Tabak violated 18 U.S.C. §1964(c) and §1962(c) through a pattern of racketeering activities involving extortion, wire and bank fraud, theft of trade secrets, and interstate transportation of stolen property.

89.     Regarding the conduct element of the RICO violation, Mr. Tabak relied on his technical position within the SUN and QZI partnerships and his access to the partnerships' online accounts, without which Mr. Tabak could not have acted.

90.     To the extent that this Circuit would hold that SUN and QZI cannot be both a RICO victim and a RICO enterprise, Mr. Feinson can nonetheless bring the RICO count in this action without SUN or QZI because Mr. Feinson personally experienced the partnerships' lost profits and costs to replace stolen property through the loss in his partnership income and the increase in his partnership costs.

91.     To rely on extortion under D.C. Code §22-3201 as a predicate act, a RICO claim requires: (1) the defendant obtained or attempted to obtain the property of another person with that other person's consent; and (2) the defendant used the wrongful use of actual or threatened force or violence or wrongful threat of economic injury to induce that consent.

92.     Mr. Tabak obtained property – in the form of software and the revenue-generating AdSense account – that belongs to Mr. Feinson, SUN, and QZI without their consent and threatened economic injury to induce their consent to Mr. Tabak's taking the property.

93.     To rely on mail or wire fraud under 18 U.S.C. §1341 and §1343 as a predicate act, a RICO claim requires: (1) a scheme to defraud, (2) material misrepresentation as part of the scheme, (3) use of the mails or wires for the purpose of executing the scheme.

94.     A large part of Mr. Tabak's relationship with Mr. Feinson in AIY, SUN, and QZI took place over telephone, email, and texts, which all qualify as wire communications. As

indicated in COUNT V, these entire relationships were an elaborate scheme to defraud Mr. Feinson by insinuating Mr. Tabak into a position of trust, responsibility, and access over valuable property and accounts.

95.     In addition, on information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery, Mr. Tabak attempted to defraud Plaintiffs via spurious and malicious Facebook charges for $364.12 on May 30, 2018, and June 6, 2018, using wire transactions both to initiate the Facebook charges and to have Facebook's billing system electronically attempt to access Mr. Feinson's Ally Bank account.

96.     The Facebook advertising transaction for $364.12 were materially false in that the then-offline AIY, SUN, and QZI websites did not need Facebook advertising.

97.     To rely on bank fraud under 18 U.S.C. §1344 as a predicate act, a RICO claim requires: (1) a scheme or artifice to defraud or false statements or misrepresentations to obtain money, (2) from a financial institution, and (3) the conduct must be done knowingly.

98.     Alternatively to wire fraud, the two attempted Facebook charges to Mr. Feinson's Ally Bank account bank for $364.12 constituted bank fraud.

99.     To rely on theft of trade secrets under 18 U.S.C. §1832 as a predicate act, a RICO claim requires: (1) the information at issue is a trade secret; (2) the defendants knowingly possessed the trade secrets; (3) the defendants knew the trade secrets were stolen or appropriated, obtained, or converted without authorization; (4) the defendants intended to convert the trade secrets to the economic benefit of anyone other than its owner; (5) the defendants knew the offense would injure the owner; and (6) the trade secrets were related to a product placed in interstate or foreign commerce.

100.    The code and software underlying the SUN Website and QZI websites are trade

secrets, as Mr. Tabak admitted by arguing releasing "[a]ll QZI code, tech, 'ideas' and any other non-content IP … into the public domain" and as memorialized in the SUN and QZI partnership agreements' provisions on confidentiality and ownership.

101.    From on or about May 20-29, 2018, for all websites other than Quizoneer.com and continuously since May 20, 2018, for Quizoneer.com, Mr. Tabak knew and intended that he was using SUN and QZI trade secrets without the permission of the partnerships to direct advertising revenue to his economic benefit, rather than to the benefit of Mr. Feinson and the partnerships.

102.    From on or about May 20-29, 2018, for all websites other than Quizoneer.com and continuously since May 20, 2018, for Quizoneer.com, the websites and trade secrets have been online in interstate and foreign commerce.

103.    To rely on interstate transportation of stolen property under 18 U.S.C. §2314 as a predicate act, a RICO claim requires: (1) property that the defendant knows to have been stolen, converted, or obtained by fraud, (2) the property has a value of $5,000 or more, and (3) transporting, transmitting, transferring, or causing the transport, transmission, or transfer of the property in interstate or foreign commerce.

104.    To rely on interstate transportation of stolen property under 18 U.S.C. §2315 as a predicate act, a RICO claim requires: (1) receiving, possessing, concealing, storing, bartering, selling, or disposing of property known to have been stolen, unlawfully converted, or taken; (2) the property has a value of $5,000 or more, and (3) the property crossed a State or United States boundary after being stolen, unlawfully converted, or taken.

105.    The AIY, SUN, and QZI software, code, and content that Mr. Tabak stole and converted s valued in excess of $5,000 – indeed, Mr. Feinson and the partnerships paid Mr. Tabak more $5,000 to create that software and code – and Mr. Tabak has transferred and transmitted the

code in interstate and foreign commerce by moving the same between digital accounts.

106.    Mr. Tabak unlawfully possessed, concealed, stored, and possibly disposed of the AIY, SUN, and QZI software, code, and content that Mr. Tabak stole, converted, and unlawfully possessed.

107.    On information and belief, formed after reasonable inquiry, which likely could be proved with an opportunity for discovery of his online accounts and computer resources, Mr. Tabak transferred and transmitted the stolen, converted, unlawfully possessed, and possibly disposed-of software, code, and content outside the United States (*e.g.*, from servers in the United States to computers in Thailand).

108.    In addition, when he re-posted the stolen, converted, and unlawfully possessed code and content during the period from approximately May 20, 2018 to May 29, 2018, Mr. Tabak transmitted and transferred the stolen, converted, and unlawfully possessed code and content in interstate commerce and across state and United States borders in several ways: (1) the stolen code and content was transmitted from a server in New Jersey to computers in states across the United States and countries around the world that accessed the content online; and (2) one or more of the following: (a) the stolen code and content was transferred from a server in New Jersey to Mr. Tabak's computer in Thailand; or (b) the stolen code or content was deleted (or disconnected) from a server in New Jersey by a computer in Thailand.

109.    For the foregoing reasons, defendant Tabak violated 18 U.S.C. §1964(c) through a pattern of racketeering activities – namely, extortion (18 U.S.C. §1961(1)(A) and D.C. Code §22-3201), wire fraud (18 U.S.C. §1343), bank fraud (18 U.S.C. §1344), theft of trade secrets (18 U.S.C. §1832), and interstate transportation of stolen property (18 U.S.C. §§2314-2315) – conducted through his position within the SUN and QZI enterprises and thereby damaged not only

his partner Mr. Feinson but also the SUN and QZI enterprises themselves.

## COUNT II
## BREACH OF CONTRACT

110.    Plaintiff incorporates Paragraphs 1-109 and 120-169 as if fully set forth herein.

111.    Under District of Columbia law, a breach-of-contract claim requires (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.

112.    The AIY contract and the SUN and QZI partnership agreements are valid contracts, supported by mutual consideration, which therefore impose their respective terms as well as the implied covenant of good faith and fair dealing.

113.    As part of the covenant of good faith and fair dealing, the AIY contract and the SUN and QZI partnership agreements impose the implied covenant that a party will not do anything that would have the effect of destroying or injuring the other parties' right to receive the contract's benefits.

114.    Under the AIY contract, Mr. Tabak breached his obligation to refrain from actions that would destroy or injure Mr. Feinson's right to continue to receive the benefits from the work for which Mr. Feinson had paid Mr. Tabak to do for the AIY Website.

115.    Under the SUN and QZI partnership agreements, Mr. Tabak breached his obligation to refrain from actions that would destroy or injure the rights of SUN, QZI, and (as partner in each) Mr. Feinson to continue to receive the benefits from the work that Mr. Tabak performed under the partnership agreements.

116.    Mr. Tabak breached obligations under the SUN agreement to provide Mr. Feinson access to the intellectual property (¶6) and to refrain from taking actions detrimental to the SUN's business (¶10).

117.    Mr. Tabak breached obligations under the QZI agreement to provide Mr. Feinson

access to the intellectual property (¶16), taking unilateral action of QZI business (¶8), denying Mr.

Feinson access to QZI records (¶11), and depositing QZI funds in an unauthorized account (¶12).

118.    Plaintiffs suffered damages from these breached obligations in lost profits, legal

expenses incurred because of Mr. Tabak's actions, the cost of replacing software and code that Mr.

Tabak removed, and lost future income from the damage to the websites' search engine indexing

with Google and other internet ratings (*i.e.*, even if the websites were restored instantly now, their

revenue potential would be lower than when Mr. Tabak acted).

119.    For the foregoing reasons, defendant Tabak breached the AIY contract and the SUN

and QZI partnership agreements, causing damage to Plaintiffs.

### COUNT III
### BREACH OF FIDUCIARY DUTY

120.    Plaintiff incorporates Paragraphs 1-119 and 126-169 as if fully set forth herein.

121.    Under District of Columbia law, a breach-of-fiduciary-duty claim requires

(1) defendant owed the plaintiff a fiduciary duty; (2) defendant breached that duty; and (3) that the

breach proximately caused injury to the plaintiff.

122.    In addition to breaching the partnership agreements themselves, Mr. Tabak also

breached the fiduciary duties imposed as a matter of law under District of Columbia law, including

the duties he holds or held as a SUN and QZI partner: (1) to account to the partnership; (2) to

hold as trustee any property, profit, or benefit derived by the partner in the conduct and

winding up of the partnership business or derived from a use by the partner of partnership

property; (3) to refrain from engaging in intentional misconduct and knowing violations of law.

123.    For purposes of fiduciary duties of care, a "knowing violations of law" means that

the defendant knew he was taking the action, not that he knew that the action was illegal.

124.   SUN and QZI suffered injury from these breached fiduciary obligations in lost profits, legal expenses incurred because of Mr. Tabak's actions, the cost of replacing software and code that Mr. Tabak removed, and lost future income from the damage to the websites' search engine indexing with Google and other internet ratings (*i.e.*, even if the websites were restored instantly now, their revenue potential would be lower than when Mr. Tabak acted).

125.   For the foregoing reasons, defendant Tabak breached his fiduciary duties under the SUN and QZI partnership agreements, causing damage to Plaintiffs.

## COUNT IV
## COPYRIGHT INFRINGEMENT

126.   Plaintiff incorporates Paragraphs 1-125 and 137-169 as if fully set forth herein.

127.   A claim for copyright infringement requires (1) ownership of a valid copyright, and (2) an infringing act of materials original to the copyrighted work.

128.   As an alternative to actual damages, under 17 U.S.C. §504(c), a copyright holder may elect statutory damages of $750 to $30,000 – or, if the infringement is willful, $150,000 – per violation.

129.   Mr. Feinson holds the copyright for the content for the AIY and SUN websites.

130.   As the copyright holder, Mr. Feinson has the exclusive right either to do or to authorize any of the following: (1} reproduce the copyrighted works; (2) prepare derivative works based, upon the copyrighted works; (3) distribute copies of the copyrighted works to the public; and (4) display the copyrighted works publicly.

131.   From on or about May 20-29, 2018, when Mr. Tabak had seized control of the websites before he took the websites offline, Mr. Tabak was posting Mr. Feinson's copyrighted content without Mr. Feinson's permission or SUN's permission.

132.    In addition to the unlawful act of posting Mr. Feinson's copyrighted content without permission, each instance of a third party's accessing, streaming, or downloading Mr. Feinson's copyrighted work infringed Mr. Feinson's copyright.

133.    Plaintiffs cannot quantify the violations without reviewing Mr. Tabak's computer system or systems and the relevant accounts.

134.    As a direct and proximate result of Defendants' infringement of Plaintiffs copyrights and exclusive rights under the Copyright Act, Plaintiff is entitled to damages as well as Defendants' profits pursuant to 17 U.S.C. §504(b).

135.    Alternatively, Plaintiff is entitled to the maximum statutory damages, in the amount of $150,000 per infringement, pursuant to 17 U.S.C. §504(c), or for such other amount as may be proper pursuant to 17 U.S.C. §504(c).

136.    For the foregoing reasons, defendant Tabak willfully violated Plaintiffs' copyrights and damaged Plaintiffs.

## COUNT V
## FRAUD AND FRAUD IN THE INDUCEMENT

137.    Plaintiff incorporates Paragraphs 1-125 and 142-169 as if fully set forth herein.

138.    Under District of Columbia law, both a claim for fraud generally and a claim for fraud in the inducement require (1) a false representation; (2) made in reference to a material fact; (3) with knowledge of its falsity; (4) with the intent to deceive; and (5) an action that is taken in reliance upon the representation.

139.    Mr. Tabak falsely represented to Mr. Feinson that Mr. Tabak would follow the SUN and QZI agreements the parties entered, when Mr. Tabak knew at the outset and did not disclose that Mr. Tabak intended to insinuate himself into a position of trust and access, from which he could attempt to exercise extortion over Plaintiffs' property.

140.     In reliance on Mr. Tabak's false statements, Mr. Feinson not only accepted those statements as true, but also relied on the statements by giving Mr. Tabak access to important assets and trying to mentor Mr. Tabak as a young entrepreneur.

141.     For the foregoing reasons, defendant Tabak fraudulently induced plaintiff Feinson to contract with Tabak to enter the SUN and QZI partnership agreements, causing damage to plaintiff Feinson.

## COUNT VI
## TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE

142.     Plaintiff incorporates Paragraphs 1-141 and 148-169 as if fully set forth herein.

143.     Under District of Columbia law, a claim for tortious interference with economic advantage requires (1) the existence of a valid business relationship or expectancy, (2) the defendant's knowledge of that relationship or expectancy, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) damages resulting from the interference.

144.     Before Mr. Tabak's tortious interference with their operations, the AIY, SUN, and QZI websites were all going concerns that generated over $2,000 monthly, which Mr. Tabak knew from his position as a contractor to AIY and a partner in SUN and QZI.

145.     Mr. Tabak intentionally took down the AIY, SUN, and QZI websites and, during the approximate May 20-29, 2018, interval intentionally redirected their revenue to a bank account under his control.

146.     Plaintiffs suffered damages from Mr. Tabak's tortious actions in lost profits, legal expenses incurred to cure Mr. Tabak's actions, the cost of replacing software and code that Mr. Tabak removed, and lost future income from the damage to the websites' search engine indexing with Google and other internet ratings (*i.e.*, even if the websites were restored instantly now, their

revenue potential would be lower than when Mr. Tabak acted).

147.    For the foregoing reasons, defendant Tabak tortuously interfered with plaintiff Feinson's AIY Website and the SUN and QZI partnerships online business, causing damage to Plaintiffs.

## COUNT VII
## CONVERSION

148.    Plaintiff incorporates Paragraphs 1-147 and 153-169 as if fully set forth herein.

149.    Under District of Columbia law, a conversion claim requires (1) an unlawful exercise, (2) of ownership, dominion, and control, (3) over another person's property, (4) in denial or repudiation of that other person's right to such property.

150.    Mr. Tabak has asserted dominion and control over Mr. Feinson's AIY property and the SUN and QZI partnerships' property, including without limitation: software and code behind the websites; the accounts with third parties holding partnership assets such as DigitalOcean.com and NameCheap.com; the AdSense account itself and revenue from that account; the PayPal account; for the approximate period May 20-29, 2018, the Plaintiffs' website content; and for the period from May 20, 2018, QZI's Quizoneer.com property.

151.    In his individual capacity regarding AIY and his partnership capacities with SUN and QZI, Mr. Feinson has demanded the return of the foregoing property, and Mr. Tabak has refused.

152.    For the foregoing reasons, defendant Tabak unlawfully converted Plaintiffs' property, causing damage to Plaintiffs.

## COUNT VIII
## JUDICIAL DETERMINATION OF EXPULSION OR WRONGFUL DISSOCIATION

153.    Plaintiff incorporates Paragraphs 1-152 and 163-169 as if fully set forth herein.

154.     Defendant Tabak appears to believe that he can end not only the partnerships but also any obligations he has under the partnership agreements by simply ceasing communication with anyone representing the partnership. As such, Tabak's ongoing position with the partnerships requires clarification from this Court under two alternate scenarios: (1) Tabak has dissociated himself from the SUN and QZI partnerships, and (2) Tabak has not yet dissociated himself from the SUN and QZI partnerships.

155.     First, as a default principle of law, a partner may dissociate from a partnership by notifying the partnership of the partner's express will to withdraw as a partner, D.C. Code §29-606.01(1), but the dissociation can be either rightful or wrongful, D.C. Code §29-606.02(a), with wrongful dissociation triggering additional liability to the dissociating partner. D.C. Code §29-606.02(b)(1), (c).

156.     Both the SUN and QZI partnership agreements include termination clauses that limit a partner's statutory right to dissociate based only on notice.

157.     Mr. Tabak's exchanges contemporaneous with his notice of his will to exit "the partnership" (presumably QZI) were erratic and may not have expressed his will. Insofar as Mr. Tabak mentioned a "the partnership" in connection with QZI, it is unclear whether he also meant to exit the SUN partnership.

158.     Second, under D.C. Code §29-606.01(5)(A), a partnership may seek judicial expulsion of a partner from the partnership if, *inter alia*, the partner has "[e]ngaged in wrongful conduct that adversely and materially affected the partnership business."

159.     To the extent that this Court would hold that defendant Tabak has not already expressly dissociated himself from the SUN or QZI pursuant to D.C. Code §29-606.01(1), Tabak has engaged in wrongful conduct to injure the SUN and QZI partnerships and their online business,

which suffices to trigger judicial expulsion.

160.    To the extent that this Court would hold that defendant Tabak has already expressly dissociated himself from SUN and QZI pursuant to D.C. Code §29-606.01(1) and that dissociation was permissible notwithstanding the SUN and QZI termination clauses, that dissociation was wrongful because Tabak breached express provisions of the SUN and QZI partnership agreements when he converted partnership assets to himself, unilaterally removed partnership IP from revenue-generating websites, and refused to turn over partnership assets and financial information when requested.

161.    The partnership's or partnerships' injuries from Tabak's wrongful dissociation include, without limitation: the lost revenue both from Tabak's initial diversion of AdSense revenue to himself and from his subsequent removal of the websites from the internet, the technical costs to reestablish the websites and all IP to their original status before Tabak's wrongful acts, the legal fees and costs expended in response to Tabak's wrongful dissociation, and reduction in future expected revenue caused by lost search engine indexing as a result of the period when the websites remained offline because of Tabak's having taken the websites down.

162.    For the foregoing reasons, Tabak has engaged in wrongful conduct that adversely and materially affected the SUN and QZI partnerships and should be expelled from the partnerships to the extent that his actions do not already constitute dissociation; alternatively, if Tabak already has dissociated himself from the SUN and QZI partnerships, his dissociation was wrongful within the meaning of D.C. Code §29-606.02.

## COUNT IX
## ACCOUNTING OF PARTNERSHIP ASSETS

163.    Plaintiff incorporates Paragraphs 1 through 162 as if fully set forth herein.

164.    An accounting is an equitable device to allow partners to enforce co-partners' duty

to hold as trustee for the partnership any benefit derived from transactions connected with the formation, conduct or liquidation of the partnership, without destroying the partnership entity.

165. In addition, the partnership agreements and partnership law require the partners to provide access to books and records, as well as the partnerships' intellectual property, all of which Mr. Feinson has requested and Mr. Tabak has refused to provide.

166. Through his actions, Mr. Tabak has scattered, hidden, and potentially destroyed partnership assets, and an accounting would aid Plaintiffs and the Court in undoing back Mr. Tabak's actions to enable an orderly winding down of the partnership and assessing the partners' liabilities to each other and to the partnerships..

167. Neither the parties nor this Court can determine the amounts due to the parties from winding up the partnerships or dissociating Mr. Tabak without having the revenue figures that Mr. Tabak has concealed, the permanent damage that Mr. Tabak may have done to the intellectual property behind each website (*e.g.*, deletion of code and damage to search engine indexes), and gathering all partnership assets under accounts commonly controlled by the partnership until its dissolution or Mr. Tabak's expulsion.

168. For the foregoing reasons, Plaintiffs are entitled to an accounting of all partnership assets.

## PRAYER FOR RELIEF

169. WHEREFORE, Plaintiffs respectfully asks this Court to grant the following relief:

A. Enter judgment in favor of Plaintiffs and against Defendant on all counts.

B. Pursuant to 28 U.S.C. §§1331, 1332, 1367, and 2201-2202, Fed. R. Civ. Proc. 57, and this Court's equitable powers, a Declaratory Judgment that:

(i) Plaintiff Mr. Feinson owns the AIY content and coding, domain registration,

AdSense revenue, and analytics data;

(ii)     Plaintiff SUN owns the SUN Website content and coding, domain registration for the SUN Domain, AdSense revenue, and analytics data;

(iii)    Plaintiff QZI owns the content and coding on the QZI websites, the QZI Domains' registration (including Quizoneer.com), AdSense revenue, and analytics data;

(iv)    The QZI loans are in default;

(v)     Mr. Tabak fraudulently induced Mr. Feinson to enter the SUN and QZI partnership agreements;

(vi)    To the extent that the Court finds Mr. Tabak to have dissociated himself from the SUN or QZI partnerships, the dissociation was wrongful.

C.     Pursuant to 28 U.S.C. §§1331, 1332, 1367, and 2201-2202, 17 U.S.C. §502, Fed. R. Civ. Proc. 57, and this Court's equitable powers, an Injunction providing that

(i)     Defendant shall restore the AIY, SUN, and QZI websites to their status on May 1, 2018;

(ii)    Defendant shall perform and expeditiously submit to the Court and Plaintiffs an accounting of all AIY, SUN, and QZI assets, property, and accounts, including any accounts that either once did or now do store or include AIY, SUN, or QZI assets or property including without limitation the accounts at DigitalOcean.com, NameCheap.com, Google AdSense, and PayPal.com;

(iii)   Defendant shall securely provide Plaintiffs the current usernames and passwords for all accounts identified in the preceding paragraph contemporaneously with filing an accounting with the Court and Plaintiffs;

(iv)   Contemporaneously with filing an accounting with the Court and Plaintiffs,

Defendant shall transfer the domains currently registered with Namescheap.com under Defendant's name (namely, SecretUniverseofNames.com, Quizinight.com and Quizoneer.com) to Mr. Feinson's GoDaddy.com account.

(v) Defendant otherwise maintain the confidentiality of all AIY, SUN, and QZI trade secrets, intellectual property, and account information;

(vi) Defendant is enjoined from publishing or using any AIY, SUN, or QZI intellectual property;

(vii) Defendant's equity in QZI is reduced pursuant to the default provisions of the QZI loan agreement;

(viii) To the extent that the Court finds Mr. Tabak not to have dissociated himself from the SUN or QZI partnerships, Mr. Tabak is judicially expelled from the SUN and QZI partnerships;

(ix) Defendant shall cease using Mr. Feinson's copyrighted works and all AIY, SUN, and QZI intellectual property;

(x) Defendant is enjoined from harassing Plaintiffs, their agents, this Court, and its officers and agents in any way, including without limitation by stalking, physical intimidation or force, or electronic or identity-related means;

(xi) Defendant shall file with this Court and serve on Plaintiffs within thirty (30) days after service of an injunction a report, in writing, under oath, setting forth in detail the manner and form in which Defendant has complied with the injunction.

D. Pursuant to 28 U.S.C. §§1331, 1332, 1367, and 2201-2202, 17 U.S.C. §502, Fed. R. Civ. Proc. 65, and this Court's equitable powers, a Preliminary Injunction providing that either Defendant shall restore and maintain the AIY Website, the SUN Website, and the QZI

Domains to their pre-dispute status quo as of May 1, 2018, or the Court shall establish a constructive trust into which Defendant shall transfer all AIY, SUN, and QZI assets, property, and accounts, including any accounts that either once did or now do store or include AIY, SUN, or QZI assets or property including without limitation the accounts at DigitalOcean.com, NameCheap.com, Google AdSense, and PayPal.com;

E.     Pursuant to 28 U.S.C. §§1331, 1332, 1367, and 2201-2202, 17 U.S.C. §504, 18 U.S.C. §1964(c), and this Court's equitable powers, damages in the amount to be proved at trial or by dispositive motion, including treble damages under 18 U.S.C. §1964(c), statutory damages under 17 U.S.C. §504(c), and punitive damages;

F.     Pursuant to 18 U.S.C. §1964(c), 17 U.S.C. §505, and any other applicable provisions of law or equity, award Plaintiffs' costs and reasonable attorneys' fees.

G.     Award Plaintiffs pre-judgment and post-judgment interest on any damage awards.

H.     Such other relief as may be just and proper.

Dated: August 9, 2018               Respectfully submitted,

/s/ Lawrence J. Joseph
_____
Lawrence J. Joseph, D.C. Bar No. 464777

1250 Connecticut Ave, NW, Suite 700-1A
Washington, DC 20036
Telephone: (202) 355-9452
Telecopier: (202) 318-2254

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

QUIZINSIGHT.COM PARTNERSHIP, )
    2731 Woodley Place, NW )
    Washington, DC 20008, )
        a District of Columbia partnership, )
  )
SECRET UNIVERSE OF NAMES )
PARTNERSHIP, )
    2731 Woodley Place, NW )
    Washington, DC 20008, )
        a District of Columbia partnership, )
  )
ROY FEINSON, )
    2731 Woodley Place, NW )     Civil Action No. 1:18-cv-1878
    Washington, DC 20008, )
  )
        Plaintiffs, )
  )
        v. )
  )
ROSS LEE TABAK, a.k.a. RAUS TABURK, )
    279 Erwin Road )
    Chapel Hill, NC 27514, )
  )
        Defendants. )
  )

## <u>VERIFICATION</u>

I, Roy W. Feinson, do state as follows:

1.    I reside in Washington, DC and am more than 18 years of age.

2.    I am the individual plaintiff in the above-captioned action, as well as a partner in plaintiffs Quizinsight.com Partnership and Secret Universe of Names Partnership, which are DC partnerships that I formed with defendant Ross Lee Tabak.

3.    I have reviewed the foregoing Verified Complaint and – with the exception of the legal contentions asserted by my attorney – the factual information and allegations contained in the Verified Complaint are true and correct to the best of my knowledge, information and belief.

4.    I have personal knowledge of the foregoing and am competent to testify to it at trial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 9, 2018.

_____
Roy W. Feinson